UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
STEPHEN J. LABELLE,                      )
                    Plaintiff,                      )
                                                    )
v.                                                   )        CIVIL ACTION NO. 22-11185-RGS
                                                    )
MARINEMAX NORTHEAST, LLC ,    )
                    Defendant.                   )
_____)

**CORRECTED MEMORANDUM OF LAW BY DEFENDANT AND PLAINTIFF-
IN-COUNTERCLAIM, MARINEMAX NORTHEAST, LLC, IN
<u>SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

The Defendant and Plaintiff-in-Counterclaim, MarineMax Northeast, LLC
("MarineMax"), hereby submits this Corrected Memorandum of Law[1] in support of its Motion for
Summary Judgment on all claims filed against it by Plaintiff, Stephen J. LaBelle ("LaBelle"), and
in support of its Counterclaim.

**INTRODUCTION**

The allegations by Plaintiff, Stephen J. LaBelle ("LaBelle") concern a 2019 Azimut 66-
FLY (the "Vessel"), a new vessel purchased from MarineMax in July 2018.  Mr. LaBelle is a
sophisticated buyer and former customer of MarineMax.  He is anything but the innocent,
sympathetic consumer described in his complaint.  His allegations suggest a level of ignorance and
confusion over certain language contained in a purchase and sale agreement, but his own
deposition testimony and background belies such characterization.  Mr. LaBelle owns a car
dealership, is invested in real estate and the cannabis business, and is fully accustomed to

_____

[1] MarineMax has refiled its exhibits under numbers (i.e., 1, 2 and 3) not letters to track its LR 56.1
Statement of Undisputed Material Facts and to comport with this Court's February 8, 2023 Standing Order
as to Citations and Exhibits (A. Kelley, D.J.).

standardized purchase and sale agreements.  By a fair reading of his complaint, you would never know that the Vessel he purchased in 2018 was his fourth boat transaction through MarineMax in just over two (2) years.  He claims his Vessel was riddled with so-called "defects" and that MarineMax was ill-equipped to properly repair them.  Yet, Mr. LaBelle has no inspection or survey reports from when he purchased the Vessel or from any time throughout his ownership of the Vessel to substantiate the alleged defects, and he has no expert.  In his complaint, Mr. LaBelle claims to have been denied the ability to conduct accurate research and due diligence into MarineMax's background, products and services, but he did not try.  Contrary to the essential allegations in his complaint, he admits that at no time was he ever prevented the opportunity from posting an honest, accurate review of his experience with MarineMax, nor does he have any evidence of any other customer who MarineMax "attempted to silence" from warning the public about the dangers of doing business with it.

In addition to seeking summary judgment on all claims brought against it by Mr. LaBelle, MarineMax seeks summary judgment on its counterclaim.  MarineMax provided winterization and storage services, paint, spring commissioning, and summer storage for which it has not been paid. It also provided parts and services to prepare Mr. LaBelle's Vessel for sale, for which it also has not been paid.

**UNDISPUTED FACTS**

*Background Information*

MarineMax is a new and used boat and yacht dealer providing sales, service, brokerage and both storage and winterization services for its customers at its marinas.  *See*, Larry Russo Affidavit (hereafter, "Russo Aff."), ¶ 1, Exhibit 1.  On or about July 25, 2018, Mr. LaBelle purchased a new 2019 Azimut 66-FLY (the "Vessel").  Russo Aff. ¶ 4, Exhibit 1, Doc No. 1 ¶ 17.

Mr. LaBelle's Vessel was manufactured and assembled in Italy and transported by cargo ship to the United States.  Russo Aff. ¶ 5, Exhibit 1.  Like every new boat, especially one of this size, there is clean-up, assembly and repairs to be performed to prepare it for delivery.  *Id*.  These vessels are custom made.  *Id*. ¶ 6.  Punch list items comprised of minor flaws and repairs are normal for this type and size vessel.  *Id*.  Just like with a custom-made home, these flaws and repairs oftentimes do not reveal themselves until the Vessel has been used for a period of time in water and allowed to settle.  *Id*.

*Mr. LaBelle's Prior Purchases Through MarineMax*

Mr. LaBelle is a sophisticated buyer and prior customer of MarineMax.  *Id*. ¶ 7.  The Vessel he purchased in July 2018 was his fourth boat transaction through MarineMax in just over two (2) years.  *Id*.  On or about April 22, 2016, Mr. LaBelle purchased a used 2015 Pursuit 385 OS Offshore at a sale price of $400,000.  *Id*. ¶ 8.  On or about April 28, 2017, Mr. LaBelle purchased a new 2017 Boston Whaler 28 OR (Outrage) at a sale price of $199,200.  *Id*. ¶ 9.  On or about August 24, 2017, Mr. LaBelle purchased a new 2017 Azimut AZ50-FLY at a sale price of $1,150,000.  *Id*. ¶ 10.  On or about July 25, 2018, Mr. LaBelle purchased the subject Vessel at a sale price of $2,225,125.  *Id*. ¶ 11.

*Purchase and Sale Agreement for the Vessel*

Mr. LaBelle executed and delivered a Purchase and Sale Agreement for the Vessel which contained "**ADDITIONAL TERMS AND CONDITIONS**" which he understood and to which he agreed.  *See*, Purchase and Sale Agreement for the Vessel, Exhibit 2.  To be sure, he had seen this same purchase and sale agreement before with his prior two (2) new vessel purchases from MarineMax, so it was not new to him.  Russo Aff. ¶¶ 9, 10, Exhibit 1.  The first two sections of "**ADDITIONAL TERMS AND CONDITIONS**" states as follows:

      1. **MANUFACTURER'S WARRANTY.** The boat, motor and accessories sold pursuant to this Agreement are sold subject only to applicable manufacturer's warranties, if any, except as otherwise expressly provided in this Agreement.

      2. **DISCLAIMER OF WARRANTIES: THE BOAT, MOTOR AND ACCESSORIES BEING PURCHASED PURSUANT TO THIS AGREEMENT ARE SOLD BY SELLER "AS IS" AND SELLER MAKES NO WARRANTIES ON ITS OWN BEHALF, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE,** unless Seller gives Buyer a written warranty on its own behalf or Seller enters into a service contract in connection with this sale or within 90 days of sale. If Seller gives Buyer a written warranty on its own behalf or enters into a service contract in connection with this sale or within 90 days of sale, then any implied warranties shall be limited in duration to the duration of Seller's written warranty or service contract.

**SELLER DISCLAIMS AND SHALL NOT BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, OR INDIRECT DAMAGES OF ANY NATURE. EXCEPT AS SET FORTH HEREIN, ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING IMPLIED WARRANTIES OF FITNESS AND MERCHANTABILITY, ARE EXPRESSLY EXCLUDED AND DISCLAIMED TO THE MAXIMUM EXTENT PERMITTED BY LAW. THE RIGHTS AND REMEDIES DESCRIBED HEREIN SHALL BE THE SOLE AND EXCLUSIVE REMEDY AGAINST SELLER. NO OTHER REMEDIES ARE AVAILABLE TO BUYER, INCLUDING BUT NOT LIMITED TO, REVOCATION OF ACCEPTANCE AND RESCISSION.** *See*, Exhibit 2.

Except for headings, the remaining "**ADDITIONAL TERMS AND CONDITIONS,**" of which there are thirteen (13), appear in upper and lower case lettering and are *not* bolded. *Id.* These same disclaimers were contained in the purchase and sale agreements for Mr. LaBelle's two previously purchased new vessels. Russo Aff. ¶¶ 9, 10, Exhibit 1.

The Purchase and Sale Agreement is governed by Rhode Island law. Paragraph 10, "**GOVERNING LAW**," states that "[t]he parties agree that this agreement shall be governed by the laws of the state in which seller is located, as designated on the front side of this agreement," which was Warwick, Rhode Island. Exhibit 2. With his Purchase and Sale Agreement, Mr. LaBelle

executed and delivered an "**ACCEPTANCE OF VESSEL**" which, in pertinent part, stated that he "accept[ed] ownership of the Vessel and risk of loss" and that he "agree[d] that [he was] solely responsible for the Vessel, risk of loss and insurance during and after MarineMax's possession." *Id*.

*Warranty Work Performed*

Following Mr. LaBelle's purchase, MarineMax performed both warranty and non-warranty services and repairs, largely cosmetic and not impacting the operation or structural integrity of the Vessel.  Russo Aff. ¶ 12, Exhibit 1.  Mr. LaBelle was never charged for a single warranty item.  *Id*.  MarineMax worked diligently to perform all service and repair work during times and seasons that would not interfere with Mr. LaBelle using his Vessel.  *Id*.  At various junctures, Mr. LaBelle was asked to remove his Vessel from MarineMax dockage and/or storage, but he refused.  *Id*. ¶ 13.  Outside of having to perform various onsite services and/or repairs, Mr. LaBelle was not prevented from using his Vessel.  *Id*.  By mid-summer 2020, MarineMax asked Mr. LaBelle, again, to retrieve his Vessel from its marina.  *Id*. ¶ 14.  By that juncture, none of the remaining warranty items were structural or mechanical and the Vessel was fully able to be used while MarineMax awaited a few parts from Italy to finish those minor repairs.  *Id*.  Sourcing parts from Azimut in Italy was rendered complicated by the fact that COVID-19 had impacted all businesses, including the Azimut factory, resulting in extraordinary shipping delays.  *Id*. ¶ 15.  As measures of goodwill, Azimut did not charge Mr. LaBelle for a certain upgrade not covered under warranty and MarineMax discounted charges for storage and winterization.  *Id*.

*Mr. LaBelle's Testimony Contradicts his Complaint Allegations*

Mr. LaBelle's first purchase of a new vessel through MarineMax was in 2017.  He testified that his only research was to drive around and look at boats specific to Boston Whalers, generally,

not even specific to the one he purchased.  *See*, Stephen LaBelle deposition testimony, Exhibit 3, pp. 51-52.  He testified that he did not conduct any research or investigation or perform any type of due diligence into MarineMax in terms of its reputation or the goods and services it offered prior to the purchase.  *Id*. pp. 54, 56-57.  His next purchase, the third through MarineMax, was a 50-foot Azimut.  Again, he performed no research or due diligence into MarineMax's goods and services, or its reputation, prior to this purchase.  *Id.* pp. 83-84.  He spoke to two customers who had 50 to 60-foot length boats, both on the same day, but those conversations were about the Azimut line and not much about MarineMax.  *Id*.  He then went back to MarineMax for his fourth purchase, the subject Vessel, the 66-foot Azimut, because he wanted a bigger boat.  *Id*. pp. 178-179.  Prior to his purchase of the 66-foot Azimut, he still had not conducted any independent research or due diligence into MarineMax's reputation or the goods and services it offered because he had firsthand knowledge of what goods MarineMax offered based on his experiences.  *Id.* p. 103.  The only research that he ever performed prior to purchasing the Vessel was to look at Azimut "floor plans and colors - that type of thing - what they offered, warranties."  *Id.* p. 169.

At no point in time during his ownership of any MarineMax vessels or his dealings with MarineMax did he ever attempt to post anything online about his experience with MarineMax.  *Id*. pp. 151-152. According to Mr. LaBelle, the "[h]onest truth... [was] because [he] didn't know how," not because MarineMax prevented him somehow.  *Id.* p. 152.  Mr. LaBelle testified that he contacted two professional advertising agencies who gave him quotes for posting online but based on the campaign that he wanted to wage against MarineMax, it would have been cost prohibitive.  *Id*. pp. 152-155.  He testified that "it was a thought in his mind" but he decided against it.  *Id.* p. 155.  Having closed discovery in this case, Mr. LaBelle has not provided a single customer name

nor has he presented any evidence of a customer who has received so-called threatening letters or been prevented from posting reviews about MarineMax.

*MarineMax's Counterclaim*

MarineMax provided Mr. LaBelle two seasons worth of winterization and storage services, paint, spring commissioning, and 2021 summer storage.  Russo Aff., ¶ 16, Exhibit 1.  Mr. LaBelle effectively abandoned his Vessel at MarineMax's facilities for over one year.  *Id*.  Mr. LaBelle has not paid for any of these services.  *Id*.  Through his counsel, Mr. LaBelle advised MarineMax that he was going to sell his Vessel.  *Id*. ¶ 17.  He asked for MarineMax's cooperation and assistance to ready his Vessel for showing at the 2021 Newport boat show.  *Id*.  He incurred charges for launching his Vessel in September 2021 which included having to replace all batteries plus the associated labor involved.  *Id*.  At all relevant times, Mr. LaBelle was made aware of the foregoing charges.  *Id*. ¶ 16.  Mr. LaBelle incurred total charges in the amount of $31,968.56 for the foregoing non-warranty services but has refused to pay MarineMax.  *Id*. ¶ 18.

**RULE 56 STANDARD**

Summary judgment is appropriate if there is no genuine issue as to any material fact and the undisputed facts show that the moving party is entitled to judgment as a matter of law.  *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 4 (1st Cir. 2010) (citing Fed.R.Civ.P. 56(c)(2)).  Once the moving party establishes that the pleadings, depositions, discovery responses, and affidavits demonstrate the absence of a genuine issue of material fact, "the burden shifts to the nonmoving party, who must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." *Id*. (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "As a general rule, that requires the production of

7

evidence that is 'significant[ly] probative.'" *Id*. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

**ARGUMENT**

I.    **Counts I, II, III, and IV Fail as a Matter of Law Based on the Express Terms of the Contract Because MarineMax Validly Excluded the Implied Warranties Under RI Gen Law Sections 6A-2-315 and 6A-2-329**

Rhode Island law provides that the implied warranty of merchantability may be validly disclaimed if the language "mention[s] merchantability and in case of a writing [it] must be conspicuous," and the implied warranty of fitness may be disclaimed if the "exclusion is by writing and conspicuous." *See Providence & Worcester R. Co. v. Sargent & Greenleaf, Inc.*, 802 F.Supp. 680, 688 (D. R.I. 1992) (quoting R.I. Gen. Laws § 6A-2-316(2)).  Further, "all implied warranties are excluded by expressions like 'as is', 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty" and when the buyer has examined the goods or has refused to do so, there is no implied warranty with regard to defects which an examination ought to have revealed.  R.I. Gen. Laws § 6A-2-316(3)(a-b).  In a consumer sale, where goods are sold "as is" or "with all faults," a disclaimer is valid when it contains conspicuous language that the goods are sold "as is" or "with all faults" and that the entire risk is with the buyer. R.I. Gen. Laws § 6A-2-329(b).

The Purchase and Sale Agreement is governed by Rhode Island law.  The disclaimers are clear and conspicuous appearing in capitalized letters and in bold print.  Mr. LaBelle agreed to the contract's clear and unambiguous terms, accepting the Vessel in its **"AS-IS"** condition. (*See*, Exhibit 2 and R.I. Gen. Laws § 6A-2-329.)  The Purchase and Sale Agreement meets the requirements for exclusion of the implied warranties of merchantability and fitness for a particular purpose.  Exhibit 2.  Moreover, LaBelle has presented no evidence that there was anything

unconscionable about the transaction in terms of sales pressure or unequal bargaining power or the like, and certainly no "fine-print" as alleged - - to the contrary. *Id*. With his Purchase and Sale Agreement, Mr. LaBelle executed and delivered an "**ACCEPTANCE OF VESSEL**" which, in pertinent part, stated that he "accept[ed] ownership of the Vessel and risk of loss" and that he "agree[d] that [he was] solely responsible for the Vessel, risk of loss and insurance during and after MarineMax's possession." *Id*.

II.    **If the Court Finds the Warranties Were not Validly Excluded, the Counts Fail Because There is no Evidence of Defect Through Expert Testimony**

Count I for Breach of Contract, Count II for Breach of Implied Warranties, and Count III for Breach of the Implied Covenant of Good Faith and Fair Dealing, each depend on the existence of defects, that MarineMax did not cure those defects, and that Mr. LaBelle was harmed thereby. These Counts depend on MarineMax having delivered the Vessel in an unfit, unmarketable condition, not conforming to standards of trade, not being able to pass without objection in the trade and being unfit for use as a boat for personal use. These Counts are fatally flawed, however, because the plaintiff does not have an inspection or survey report to identify these alleged defects when the Vessel was delivered, or anytime thereafter, and he has no expert. He cannot establish that he was damaged by the alleged defective nature of the Vessel. By contrast, as explained by Mr. Russo in his affidavit under Exhibit 1, MarineMax performed both warranty and non-warranty services and repairs, largely cosmetic and not impacting the operation or structural integrity of the Vessel. Russo Aff., ¶12, Exhibit 1. Mr. Russo testified in his affidavit that Mr. LaBelle was not prevented from using his Vessel outside of MarineMax having to perform various onsite services and/or repairs. *Id*.

### A.  Proving Defect

"In order to establish liability for breach of the implied warranty of merchantability, a plaintiff must prove that the product is defective, that it was in a defective condition at the time it left the hands of the seller, and that said defect is the proximate cause of the injury." *Oberlander v. Genera. Motors Corp.*, 798 A.2d 376, 379 (R.I. 2002) (quoting *Lariviere v. Dayton Safety Ladder Co.*, 525 A.2d 892, 896 (R.I. 1987)). Further, that defect must be proven to be "attributable to the defendant" and "the proximate cause of plaintiff's injury." *See id.* (citing *Simmons v. Lincoln Elec. Co.*, 696 A.2d 273, 274-75 (R.I. 1997)).

### B.  Expert Testimony is Required

"The five elements of an action for breach of implied warranty of merchantability are '(1) that a merchant sold goods, (2) which were not merchantable at the time of sale, and (3) injury and damages to the plaintiff or his property (4) caused proximately and in fact by the defective nature of the goods, and (5) notice to seller of injury,'" *Electric Terminal Corp. v. Cessna Aircraft*, 520 A.2d 144, 147 (R.I. 1987) (quoting White and Summers, *Uniform Commercial Code*, § 9-6 at 343 (2d ed. 1980)).  To sustain its burden as to the fourth element, the plaintiff is required to prove more than "the happening of an occurrence," and must show "the causal nexus between the happening of the occurrence and the alleged breach of the implied warranty of merchantability." *Thomas v. Amway Corp.*, 488 A.2d 716, 719 (R.I. 1985).  In *Electric Terminal*, the court found "the lack of expert testimony on the question of the fitness of the aircraft or its engines at the time of sale by the defendants [to be] certainly in and of itself fatal…[where] no reasonable juror could conclude that a breach of the implied warranty had taken place." *Electric Terminal Corp.*, 520 A.2d at 146 (noting without evidence of chain of distribution or maintenance history, one could not be sure the problems were not a matter of inferior upkeep or repair and therefore the causal

link was missing). The First Circuit has further noted that "the presence of a defect typically cannot be inferred in the absence of expert testimony." *Vigilant Ins. Co. v. Energy Savings Products, Ltd.*, 2017 WL 1682533 at *3 (D.Mass. 2017) (quoting *King v. Pierce Mfg., Inc.*, 608 Fed.Appx. 18, 20 (1st Cir. 2015)). "Thus, for a product to be 'reasonably fit' for its purposes, expert testimony should demonstrate that the design avoids the 'reasonably foreseeable risks attending the product's use.'" *Id*. (quoting *Back v. Wickes Corp.*, 375 Mass. 633, 641 (1978)).

Count III, Breach of the Implied Covenant of Good Faith and Fair Dealing, adds the allegation that Mr. LaBelle incurred or was charged unnecessary and/or improper fees and costs that destroyed or injured his rights under the Purchase and Sale Agreement and that he was deprived the ability to make meaningful use of and enjoyment of the Vessel while he owned it. Doc No. 1, ¶72. As set forth in Mr. Russo's affidavit, however, Mr. LaBelle was never charged for a single warranty item. Russo Aff., ¶12, Exhibit 1. At various junctures, Mr. LaBelle was asked to remove his Vessel from MarineMax dockage and/or storage, but he refused. *Id.* ¶13. By mid-summer 2020, MarineMax asked Mr. LaBelle, again, to retrieve his Vessel from its marina, but again he refused. *Id*. ¶14. Mr. LaBelle effectively abandoned his Vessel at MarineMax for over one year, during which time he made the conscious decision not to use and enjoy his Vessel. He cannot demonstrate that he incurred a single charge for a warranty item, and he cannot demonstrate that he was deprived the ability to use his Vessel (at any time) due to any so-called defect because, again, he has no expert to establish that causal link.

III. **The Plaintiff's Claim Under Count IV Fails as a Matter of Law Because the Contractual Choice of Law Clause Requiring Rhode Island Law Bars Application of the Massachusetts 93A Claim**

Plaintiff's 93A claim fails as a matter of law based on the Agreement's choice-of-law clause, which designates the state in which the seller is located, in this case Rhode Island, as the

governing law. "In a diversity action, the Court applies the choice of law rules of the forum state, in this case Massachusetts." *Soo v. Bone Bioligics Corporation*, 2020 WL 4673521 at *3 (D. Mass. 2020) (citing *Aspect Software, Inc. v. Barnett*, 787 F.Supp. 2d 118, 125 (D. Mass. 2011)). Generally, Massachusetts will enforce a choice of law provision when the parties agree upon its terms in a contract, unless its application would be contrary to a fundamental policy of a state with a greater interest in the determination of the particular issue and would otherwise be the state of relevant law without the applicable choice of law provision. See *id*. (citing *Morris v. Watsco, Inc.*, 433 N.E.2d 886, 888 (Mass. 1982); see also *Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F.Supp.2d 217, 229 (D.Mass. 2011) (quoting Restatement (Second) of Conflict of Law § 187(2)(b) (1971)). Where the parties have used "embracing language" in the relevant provision, the Court should construe them broadly as reflective of the intention of the parties. *See, Soo*, 2020 WL at *3 (quoting *Huffington v. T.C. Group, LLC*, 637 F.3d 18, 21-23 (1st Cir. 2011)). Further, "[w]here a chapter 93A claim is essentially contract-based…arguments to bifurcate the choice of law analysis have not prevailed." *Value Partners S.A. v. Bain & Co., Inc.*, 245 F.Supp.2d 269, 274 (D. Mass. 2003).

Because the alleged contractual violations form the basis of Plaintiff's contractual choice-of-law clause, application of the Massachusetts statute is therefore barred. *See, Worldwide Commodities, Inc. v. J. Amicone Co., Inc.*, 630 N.E.2d 615, 618 (Ct.App.Mass. 1994) (barring application of Massachusetts unfair trade practices statute where claim arose out of contractual violations); *see also, Nizhoni Health Systems LLC v. Netsmart Technologies, Inc.*, 2023 WL 3657386 at *8 (D. Mass. 2023) (noting 93A claims that "embroidered breach of contract claims" fell within ambit of choice-of-law provision).

**IV.    Plaintiff's 93A Claim Fails on the Facts Because of Mr. LaBelle's Own Admissions and Because he has no Evidence of his Customer Allegations**

Outside of his claimed defects, Mr. LaBelle complains in his 93A Count that MarineMax includes a non-disparagement provision in its purchase and sales agreements with its customers. Compl. ¶82.  He alleges that such provisions prohibit MarineMax customers from providing the public with "accurate, negative feedback concerning the customers' respective experiences with MarineMax." Doc No.1, ¶ 82.  Mr. LaBelle alleges that MarineMax "aggressively" enforces those non-disparagement provisions against its customers through the use of such tactics as "threatening letters." *Id*. ¶ 82.  He alleges that MarineMax attempts to silence its customers from warning the public about the potential dangers and pitfalls involved in buying boats from MarineMax. *Id*. ¶82. Finally, Mr. LaBelle claims that he was "denied the ability to perform accurate due diligence prior to purchasing new products and services from MarineMax." *Id*. ¶¶85, 87.  Mr. LaBelle claims that over the course of the summer of 2018, while negotiating the purchase of his Vessel from MarineMax, he "conducted research into MarineMax's background, products, and services" but "was denied the ability to get accurate information concerning MarineMax and its reputation." *Id*. ¶ 15. By his own admissions, *none* of these allegations are true.

Mr. LaBelle testified that he did not conduct any research or investigation or perform any type of due diligence into MarineMax in terms of its reputation or the goods and services it offered prior to the purchase of his first new Vessel.  Exhibit 3 at pp. 54, 56-57.  His next new Vessel purchase, the third through MarineMax, was a 50-foot Azimut.  Again, he performed no research or due diligence into MarineMax's goods and services, or its reputation, prior to this purchase. *Id*. at pp. 83-84.  He claims he spoke to two customers who had 50–60-foot length boats, both on the same day, but those conversations were about the Azimut line and not much about MarineMax. *Id*.   He then went back to MarineMax for his fourth purchase, the subject Vessel, the 66-foot

Azimut, because he wanted a bigger boat.  *Id*. at pp. 178-179.  Prior to his purchase of the 66-foot Azimut, he still had not conducted any independent research or due diligence into MarineMax's reputation or the goods and services it offered because he had firsthand knowledge of what goods MarineMax offered based on his experiences.  *Id*. at p.103.  The only research that he ever performed prior to purchasing the Vessel was to look at Azimut "floor plans and colors - that type of thing - what they offered, warranties."  *Id*. at p.169.

At no point in time during his ownership of any MarineMax vessels or his dealings with MarineMax did he ever attempt to post anything online about his experience with MarineMax.  *Id*. at pp. 151-152.  In fact, according to Mr. LaBelle, the "[h]onest truth... [was] because [he] didn't know how," not because MarineMax prevented him from doing so.  *Id*. at p. 152.  Mr. LaBelle testified that he contacted two professional advertising agencies who gave him quotes for posting online but based on the campaign he wanted to wage against MarineMax, it would have been cost prohibitive. *Id*. at p. 152-155.  He testified that "it was a thought in his mind" but he decided against it.  *Id*. at p. 155.  As for other customers, Mr. LaBelle has not provided a single customer name nor has he presented any evidence of a customer who has received so-called threatening letters or been prevented from posting reviews about MarineMax - - ever.

Even assuming arguendo that Rhode Island law does not apply, "[i]t is well established that to allege a violation of Chapter 93A, a plaintiff must show that the disputed conduct falls within a 'common-law, statutory, or other established concept of unfairness.'"  *Carrozza v. CVS Pharmacy, Inc.*, 992 F.3d 44, 61 (1st Cir. 2021) (quoting *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 15 (1st Cir. 1999)).  However, not only must Mr. LaBelle establish unfair or deceptive conduct, but he must also prove causation by showing that the alleged conduct "caused an adverse consequence or loss."  *See Walsh v. TelTech Systems, Inc.*, 821 F.3d 155, 160 (1st Cir. 2016)

(quoting *Rhodes v. A.I.G. Domestic Claims, Inc.*, 961 N.E.2d 1067, 1076 (Mass. 2012). Failure to prove both factual and proximate causation is fatal to a 93A claim. *Id*.

## V.    The Consumer Review Fairness Act Does not Prohibit Non-Disparagement Clauses in Contracts and Mr. LaBelle was not Prevented From Posting an Accurate, Truthful Review on the Internet, nor did he try

Count V asks this Court to issue a declaratory judgment regarding the enforceability of the non-disparagement provision in the Purchase and Sale Agreement and asks that this Court declare the rights and other legal relations of the parties, including those pursuant to 15 U.S.C. § 45b, the Consumer Review Fairness Act ("CRFA"). Indeed, Counts IV and V rely in substantial part on a violation of the CRFA. That said, there is no private right of action and it can only be enforced by the Federal Trade Commission or state attorneys general. *See Quigley v. Yelp*, 2018 WL 7204066 at *3 (N.D. Ca. Jan. 22, 2018) (dismissing CRFA claim because the CRFA is "by its terms enforced only by the Federal Trade Commission or state attorneys general."); *see also Xu v. Google, Inc.*, 2022 WL 3586166 at fn.1 (N.D. Ill. Aug. 22, 2022) (explaining that a claim based directly on a violation of the CRFA would fail due to the lack of a private right of action); *see also, Seibert v. Precision Contracting Solutions, LP*, 2019 WL 935637 at *8 (noting 15 U.S.C. § 45b subject to enforcement by the FTC without a suggestion of a private right of action).

Even if the CRFA is being relied only to support Mr. LaBelle's 93A claim, it does not prohibit provisions in form contracts that prohibit the disclosure or submission "on an Internet website or webpage" of "content that is unlawful or otherwise meets the requirements of paragraph (2)(C)(iii); namely, that the submission "is clearly false or misleading." In his complaint, Mr. LaBelle objects to having received a warning letter from MarineMax's general counsel that MarineMax would seek to enforce its Purchase and Sale Agreement non-disparagement provision by commencing a lawsuit against him. Doc No.1, ¶35. Mr. LaBelle hung large disparaging

banners, "about fifteen (15) of them," at MarineMax's Quincy marina with the words, "NO SERVICE BUT LIP SERVICE," which prompted the letter. Exhibit 3, pp. 150-151. Regardless, Mr. LaBelle testified that he never attempted to post anything online, and that to wage a campaign against MarineMax would have been cost-prohibitive; *not* that he was ever prevented from doing so by an alleged threatening letter. *Id*. at pp. 152-155.

Because Mr. LaBelle's substantive claim under the CRFA fails as a matter of law, he may not pursue his requested declaratory relief. *See Long v. Dell*, 93 A.3d 988, 1004-05 (R.I. 2014) (affirming dismissal of request for declaratory relief where underlying causes of action related to same were unavailable to plaintiff); *see also Buck v. American Airlines*, *Inc.*, 476 F.3d 29, 33 n.3 (1st Cir. 2007) (noting 28 U.S.C. s. 2201(a) creates a remedy, not cause of action); *Langadinos v. Board of Trustees of University of Massachusetts*, 2013 WL 5507042 at *15 (D. Mass. 2013) (finding plaintiff unable to maintain claim for declaratory relief where substantive claims were subject to dismissal).

**VI.    Summary Judgment Should Enter for the Defendant on Count II of its Counterclaim in Quantum Meruit Because the Plaintiff Derived a Benefit from the Services MarineMax Conferred Upon him for Which he has not Paid**

MarineMax seeks summary judgment on its Counterclaim. MarineMax provided Mr. LaBelle two seasons worth of winterization and storage services, paint, spring commissioning, and 2021 summer storage. Russo Aff., ¶ 16, Exhibit 1. He had effectively abandoned his Vessel at MarineMax's facilities for over one year. *Id*. Mr. LaBelle has not paid for any of these services. *Id*. Through his counsel, Mr. LaBelle advised MarineMax that he was going to sell his Vessel. *Id*. ¶ 17. He asked for MarineMax's cooperation and assistance to ready his Vessel for showing at the 2021 Newport boat show. *Id*. He incurred charges for launching his Vessel in September 2021 including having to replace all batteries plus the associated labor involved. *Id*. At all relevant

times, Mr. LaBelle was made aware of the foregoing charges. *Id*. Mr. LaBelle incurred total charges in the amount of $31,968.56 for the foregoing non-warranty services but has refused to pay MarineMax. *Id*. ¶ 18.

An action for quantum meruit is a claim "for the reasonable value of services rendered," and provides for recovery "in an amount considered reasonable to compensate a person who has rendered services in a quasi-contractual relationship." *See Process Engineers & Constructors, Inc. v. DiGregorio, Inc.*, 93 A.3d 1047, 1052 (R.I. 2014) (quoting Black's Law Dictionary 1361, 1361-62 (9th ed. 2009)). In order to sustain an action in quantum meruit, the party seeking to recover must show that the other "derived some benefit from the services and would be unjustly enriched without making compensation thereof." *See id*. (quoting *National Chain Co., v. Campbell*, 487 A.2d 132, 135 (R.I. 1985)). Quantum meruit focuses on the value of services rendered and generally applies when one has provided services, and the recipient has refused to pay. *See id*. (quoting *Parnoff v. Yuille*, 57 A.3d 349, 355 n. 7 (Conn. App. 2012)).

Because an action arising in quantum meruit compensates for services rendered in a quasi-contractual relationship, the plaintiff must prove the existence of a quasi-contract, which requires that "(1) the plaintiff conferred a benefit on the defendant, (2) the defendant appreciated the benefit, and (3) under the circumstances it would be inequitable for the defendant to retain such benefit without payment of the value thereof." *Fondedile, S.A. v. C.E. Maguire, Inc.*, 610 A.2d 87, 97 (R.I. 1992). Mr. LaBelle signed a storage contract, and he received invoices for winterization services. Russo Aff., ¶ 16, Exhibit 1. When he requested that MarineMax prepare his boat for launching to be shown at the Newport boat show for potential sale, he could not reasonably have expected that MarineMax would perform those services, including having to replace batteries, at no charge. In fact, prior to the Newport boat show, his counsel sought clarification on the amount that

17

MarineMax believed it was owed. *Id*. ¶ 17. Mr. LaBelle accepted the benefit of those services without objection.

## CONCLUSION

For all of the foregoing reasons, MarineMax Northeast, LLC, respectfully requests that this Court enter summary judgment on all claims filed against it by Plaintiff, Stephen J. LaBelle, and that it be granted summary judgment on its Counterclaim.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(d), MarineMax respectfully requests a hearing on its Motion to the extent the Court believes that oral argument would be helpful in resolving its Motion.

**MARINEMAX NORTHEAST, LLC,**

By its Attorneys,

Dated: November 17, 2023

*/s/ Douglas B. Otto*
Douglas B. Otto (BBO#555269)
Hannah Sfameni (BBO#705864)
DARROWEVERETT LLP
50 Congress Street
Suite 1040
Boston, MA 02109
(617) 443-4500
dotto@darroweverett.com

## CERTIFICATE OF SERVICE

I, Douglas B. Otto, do hereby certify that a copy of the foregoing Corrected Memorandum of Law has been filed through the Court's CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF) and paper copies will be sent by first class mail, postage prepaid, to those indicated as non-registered NEF participants.

Dated: November 17, 2023

*/s/ Douglas B. Otto*
Douglas B. Otto